IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )    Criminal Action No.
                               )    13-03041-01-CR-S-DGK
BRUCE CONANT,                  )
                               )
            Defendants.        )

**REPORT AND RECOMMENDATION TO DENY**
**DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

Before the court are defendant's motion to suppress evidence seized from his residence on July 16, 2012 (document number 47) and motion to suppress evidence seized from his storage unit on July 17, 2012 (document number 46). Defendant argues that the affidavit in support of the warrant to search his residence does not establish probable cause because it includes information provided by a confidential informant ("CI") and the affidavit does not show corroboration, direct knowledge by the CI or evidence of the CI's reliability. Defendant also argues that the affidavits in support of the search warrant for the storage unit contained false information. I find that (1) it was objectively reasonable for the officers executing the search warrant at defendant's residence to have relied in good faith on the judge's determination that there was probable cause to issue the warrant, and (2) there was no false information in the affidavits supporting the warrant to search the storage facility. Therefore, defendant's motions to suppress should be denied.

# I.   BACKGROUND

On July 16, 2012, Officer Victor Weir applied for a search warrant for defendant's home at 609 Sunset Drive, Waynesville, Missouri.  The affidavit in support of the search warrant included the following probable cause statement:

> On 7/15/12 CI 2011-12-2 who has proven reliable in the past on six separate occasions, gave me information that Methamphetamine is being distributed from and stored at this location.  CI 2011-12-2 told me that James Rhodenizer who lives at 723 East Main Street in Richland, purchases quantities of Crystal Methamphetamine from Bruce and Rendy Conant who reside and own the property at this address and is in Pulaski County, MO.  It is further stored in a storage unit located off the 140 mile marker of I-44 in Laclede County.  A search warrant was executed in Pulaski County and in the city of Richland on 6/23/12 and the CI advised me that the crystal methamphetamine found in Mr. Rhodenizer's possession was purchased from Bruce and Rendy Conant by James Rhodenizer.  CI 2011-12-2 stated that there is enough on hand for sales; however the bulk is stored at the storage shed in Laclede County.  CI 2011-12-2 further stated that on or about 07/12/12 the Conant's [sic] brought a new supply of methamphetamine to the area.

The search warrant was issued and executed that same day, and police recovered methamphetamine, digital scales, a large quantity of sophisticated surveillance equipment, approximately $80,000 in cash, documents, and other items.  One of the documents seized was a statement from Mid-Town Storage for Unit 33 for the month of June 2012.  It was billed to Bruce Conant at the residence that had just been searched.  In addition, police at the jail where defendant was taken upon his arrest recovered from his wallet a SecuraKey for Mid-Town Storage in Lebananon, Missouri, which is in Laclede County.

The following day, a search warrant was obtained by
Detective John Young and executed on the storage unit where
police recovered a revolver, $329,780[1] in cash, and other items
associated with drug manufacture and distribution.  There were
two affidavits in support of that warrant -- one by Deputy John
Young and one by Officer Victor Weir.  The affidavit signed by
Deputy Young includes the following:

> On July 16, 2012 I was notified that a subject
> identified as Bruce R. Conant was concealing a large amount
> of methamphetamine and U.S. currency within his residence
> located in Pulaski County, Mo.  I was also notified that
> Bruce R. Conant was concealing methamphetamine and currency
> within a storage unit located at 210 Clough St. unit #33,
> Lebanon, Laclede County, MO.  A search warrant was executed
> upon the residence in Pulaski County, Mo.  On July 17, 2012
> large quantities of methamphetamine and currency were seized
> from the residence of Bruce R. Conant.  Also seized was a
> receipt for Mid-Town Storage unit #33 for June 2012[2] rent.
> The receipt was signed by "Bonnie".  A magnetic key card/fob
> was located in the wallet of Bruce R. Conant for Mid-Town
> Storage.  Mid-Town Storage uses a card unlike other storage
> facilities in the surrounding area.
>
> On July 17, 2012 approximately 0200 hours I contacted
> Lebanon Police officer Ralph Robinson to assist by using his
> K-9 Dax to check unit #33 at Mid-Town Storage.  Officer
> Robinson and his K-9 arrived at 210 Clough Lebanon Laclede
> County, Mo. . . .  The K-9 Dax indicated on Unit #33 by
> scratching and barking.  Officer Robinson pulled the K-9
> back and walked down the row of unit[s] again.  The K-9 Dax
> indicated again on unit #33.

---

[1]This dollar figure came from the government's response.
The search warrant inventory does not include a total but lists
"cash bundles" (P. Ex. 3).  There does not appear to be a dispute
over the amount seized.

[2]Elsewhere the receipt is said to have been for May 2012
rent; however, I find the discrepancy immaterial as both months
are shortly before the July 2012 discovery of the statement which
is actually dated May 20, 2012, and indicates that the storage
rent is due on June 1, 2012 (P. Ex. 2).

The affidavit prepared by Officer Weir includes the following:

> On 07/15/12 I executed a search warrant at 609 Sunset Dr. in Waynesville, MO and in Pulaski County, MO. The search warrant was based on information from a reliable confidential informant. The residence was owned and occupied by Bruce and Rendy Conant. The result of the search revealed over $80,000 in Currency and approximately 116 grams of Crystal Methamphetamine. The CI also told me that a large quantity of Crystal Methamphetamine was held at a storage facility in Laclede County, MO. While searching I discovered a receipt for a storage facility in Lebanon, MO and within Laclede County. The facility was Mid-Town Storage and the unit was #33. Bruce Conant had a Secure Key security access card in his wallet.

On May 8, 2013, an indictment was returned charging defendant with conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm after having been convicted of a felony.

On September 5, 2013, defendant filed the instant motions to suppress. On October 15, 2013, the government filed a response (document number 55) in opposition. On October 29, 2013, this case was transferred to me for processing.

I held a hearing on defendant's motions on January 28, 2014. Defendant appeared in person, represented by Donald Cooley. The government was represented by Assistant United States Attorney Ami Miller. The following witnesses testified:

1. Officer Victor Weir, Waynesville, Missouri, Police Department

2. Detective John Young, Laclede County Sheriff's Office

The following exhibits were admitted:

P. Ex. 1  Search warrant dated July 16, 2012

P. Ex. 2  Mid-Town Storage Statement

P. Ex. 3  Search warrant dated July 17, 2012

P. Ex. 4  Search warrant dated July 22, 2012

P. Ex. 5  Dog certification

## II.  *FINDINGS OF FACT*

Based on the evidence presented during the hearing, I make the following findings of fact:

1.    Officer Victor Weir, Waynesville, Missouri, Police Department, has been in law enforcement for 14 years during which he received 470 hours of initial training and in excess of 48 hours of continued training every three years (Tr. at 6).  He received 40 hours of narcotics investigation training through the Missouri Highway Patrol, and he has received training in how to interview and deal with confidential informants (Tr. at 7-8). Officer Weir has been a patrolman but in July 2011 he began working in narcotics as well (Tr. at 6).  During the course of his career, Officer Weir has applied for in excess 50 search warrants, and he has worked with approximately 50 confidential informants (Tr. at 7, 8).  He has been a part of 300 or more drug investigations (Tr. at 7).  When Officer Weir uses information from a confidential informant to get a search warrant, he determines whether the informant knows the information first-hand or whether the informant heard the information from some other

source, but Officer Weir does not always make that distinction in his affidavits (Tr. at 29-30).

2.     Detective John Young, Laclede County Sheriff's Office, has been in law enforcement for 17 years (Tr. at 75).  He initially had 470 hours of training through the Sheriff's Academy, and has received continuing education or training (Tr. at 75).  He has authored "numerous" affidavits in support of search warrants, and he has worked on narcotics cases "numerous" times (Tr. at 76).

3.     During the summer of 2012, Officer Weir was asked to investigate an alleged first-degree assault in which someone tried to crucify Travis Pierce in his mobile home in the Crocker area (Tr. at 9).  Mr. Pierce lost a toe during the incident which was allegedly the result of a dispute over methamphetamine from James Rhodenizer (Tr. at 9).  Through his investigation Officer Weir learned[3] that Rhodenizer was distributing marijuana and methamphetamine (Tr. at 9).  Rhodenizer's associate, James Moore, had multiple locations[4] from which drugs were being distributed -- one off T Highway; one off Riverside Drive in Pulaski County, which is about a mile from Mr. Moore's residence; and one at 723

---

[3]Officer Weir did not testify how he learned this information, but his subsequent testimony dealt with information from confidential informants (Tr. at 10).

[4]Officer Weir testified that Moore had "two" locations; however, he then named three:  "one off T Highway, one off Riverside Drive in Pulaski County . . . [a]nd then there was a residence 723 East Main Street in Richland in which they were being distributed at well." (Tr. at 9).

East Main Street in Richland (Tr. at 9).  All of these locations
are in Pulaski County (Tr. at 9).

4.    An informant told Officer Weir that defendants Bruce
and Rendy Conant had sold approximately "an ounce or more" of
methamphetamine to Rhodenizer (Tr. at 10).

5.    Officers executed search warrants on multiple
addresses:  "There were two residence[s] –– four residences and a
shop building.  There was three property locations.  There was ––
Riverside Drive there was a trailer, a house, and a storage
building, a shop building, on T Highway, which was James Moore's
actual house, and then James Rhodenizer's house." (Tr. at 10).
Two of the confidential informants who provided information to
obtain these search warrants also provided information to police
about defendants (Tr. at 10).  One of these informants provided
information directly to Officer Weir and was an informant with
whom Weir had worked before (Tr. at 11).

6.    During execution of a search warrant on James
Rhodenizer's home on June 28, 2012, methamphetamine was recovered
(Tr. at 11, 37, 43).  A confidential informant told police that
the methamphetamine recovered from Rhodenizer's residence had
been purchased from defendants (Tr. at 11, 13).  The informant
had gotten this information not through first-hand knowledge but
from another informant who had seen the drugs there (Tr. at 46).
The informant said that every few weeks defendants were making a
trip to Kansas City to pick up methamphetamine (Tr. at 12).  The
informant stated that defendants stored drugs in a storage unit

located off mile marker 140 on I-44 in Laclede County, and that there may be more than one storage unit but the informant did not know the particular locations (Tr. at 21-22, 61, 93, 95, 101). The informant had gotten this information from someone who had personal knowledge of this fact, and the person who told the informant this had seen drugs within a week of providing this information (Tr. at 46, 50-51, 52). Officer Weir contacted Detective John Young in Laclede County (which is outside the jurisdiction of the Waynesville Police Department), a narcotics investigator (Tr. at 22). Officer Weir provided this information about the storage unit to Detective Young because mile marker 140 on I-44 was in Young's jurisdiction (Tr. at 23, 52, 76).

7.     Officer Weir only provided information about the storage locker to Detective Young, he did not go to mile marker 140 to look for a storage unit because that is outside his jurisdiction (Tr. at 22, 36). He did go to the courthouse and city hall to verify that the residence and the utilities were in the name of Bruce and Rendy Conant (Tr. at 41). However, he later spoke to the other informant who had first-hand knowledge of these facts regarding defendants' drug possession (Tr. at 53). Officer Weir asked the informant about the drugs observed at defendants' residence, but he did not ask about the storage unit (Tr. at 53-54).

8.     Officer Weir had ongoing conversations with Detective Young in Laclede County about storage facilities prior to seeking any search warrants (Tr. at 76-77). Detective Young knew of a

storage facility at mile marker 140, and he went to that facility several times (Tr. at 88). He attempted through confidential sources to determine whether defendants had a storage unit at this facility (Tr. at 89). He did not take a drug dog to the facility or talk to the owners due to ongoing-investigation concerns (Tr. at 89).

9. On July 16, 2012, Officer Weir applied for a warrant to search defendants' home (Tr. at 14-15). In the affidavit, Officer Weir referred to the information that had been provided by the first confidential informant, but not the information that had been provided by the second confidential informant with first-hand knowledge (Tr. at 31). In the affidavit, Officer Weir did not say where the confidential informant got the information that was shared with law enforcement (Tr. at 31-32). The prosecuting attorney (Ken Clayton) knew the informant's information was not based on first-hand knowledge, but he did not instruct Officer Weir to make that distinction in the affidavit (Tr. at 38-39). The prosecuting attorney also did not point out any problem with the lack of information in the affidavit establishing the reliability of the informant (Tr. at 39-40). The informant who provided the information for the warrant was working off a case; and although the prosecutor was aware of this, that information was not included in the affidavit (Tr. at 46). At the time the informant was providing information, no promises had been made regarding reducing or dismissing charges against the informant (Tr. at 60). The prosecutor said he would

look at the totality of the assistance, but no promises had been made to the informant (Tr. at 62).

10.  Officer Weir stated in the affidavit that the informant had proven reliable on six separate occasions (Tr. at 15; P. Ex. 1).  Excluding the Rhodenizer search warrants, this confidential informant had proven reliable in at least three other search warrants which had resulted in the seizure of narcotics and three other consensual searches (Tr. at 15–16).  Officer Weir provided the information about defendants to acting prosecutor Ken Clayton (Tr. at 16).  Officer Weir then met with Mr. Clayton and drafted the search warrant documents (Tr. at 16).  Officer Weir provided Mr. Clayton with additional information, but he did not want to include that in the affidavit due to concerns over the safety of the confidential informant (Tr. at 16, 23).  Mr. Clayton reviewed the affidavit and proposed search warrant that had been prepared by Officer Weir (Tr. at 16).

11.  Officer Weir had worked with Mr. Clayton in the past, and there had been occasions in the past when Mr. Clayton denied a search warrant application because there was not enough information in the application to establish probable cause (Tr. at 17).  On those occasions, Mr. Clayton told Officer Weir to gather more information (Tr. at 17).  However, when Officer Weir provided Mr. Clayton with the application and affidavit for a warrant to search defendants' residence, Mr. Clayton signed the affidavit and forwarded it to the judge (Tr. at 17–18).  Officer

Weir did not speak to Judge Storie when the search warrant for defendants' residence was obtained (Tr. at 16, 18; P. Ex. 1).

12.   Officer Weir was present on July 16, 2012, when the search warrant was executed at defendants' residence (Tr. at 18). The defendants were home (Tr. at 40).  In the office area of the home, Officer Weir recovered coins, a fake book with methamphetamine inside, a smoking device, and a black box with approximately $18,000 cash and more methamphetamine (Tr. at 19). Officer Weir also found a statement for a storage rental unit at Mid-Town Storage in defendants' office area (Tr. at 20; P. Ex. 2).  The only address was a P.O. Box, so he pulled it up on Google and "it showed it as possibly being at the 140 mile marker." (Tr. at 24).  He called Detective Young who also thought Mid-Town Storage could be at mile marker 140 (Tr. at 24, 56, 77–78).  The officers executing the search warrant seized computers, vehicles (including one at a different location), coin collections, etc., because "there was a great possibility that they had been purchased through use of drug funds" and, after a drug dog had alerted on the cars, Officer Weir believed they had been used to transport illegal drugs (Tr. at 57, 68).  The car that was at a different location was at a repair shop, and it was the subject of a K-9 search (Tr. at 57, 69).  The dog alerted positively to the car before it was seized (Tr. at 57).  A dog also alerted to two cars at the residence which were searched, but nothing was found inside them (Tr. at 65–66, 68).  The dog is

NAPWDA[5] certified (Tr. at 68).  Once the cash and drugs had been found, DEA agents showed up and determined that the case would likely be handled by them, and they took custody of the evidence (Tr. at 59).

13.  Both of the defendants were arrested and taken to jail, and a copy of the search warrant was left at the jail for them (Tr. at 66, 70).

14.  Detective Young drove out to exit 140 and started looking for the Mid-Town Storage facility (Tr. at 78).  He did not find it there (Tr. at 78).  He started driving around trying to locate a storage facility named Mid-Town (Tr. at 78).  He eventually located it at 210 Clough in Lebanon which is in Laclede County (Tr. at 78).  He contacted the Pulaski County officers to see if there had been a magnetic strip card in the property seized from defendant's residence, because this storage facility was a secure facility which used cards with magnetic strips for access to the main gate (Tr. at 79).  Detective Young learned that a magnetic strip card had been found in Bruce Conant's wallet at the jail after his arrest (Tr. at 79).  A law enforcement officer brought the card to Detective Young who used it to open the front gate of the storage facility (Tr. at 79).  He then asked the Lebanon Police Department to send a K-9 to the storage facility (Tr. at 79-80).

---

[5]North American Police Work Dog Association.

15. Dax, a police dog certified in the detection of methamphetamine, cocaine, heroin and marijuana, was brought to the storage facility (Tr. at 80; P. Ex. 5). Dax was walked up and down the row of units, and he scratched and barked at unit 33 (Tr. at 81, 102-103). He was pulled away from the door of unit 33, taken to the beginning of the row, and walked down the row again (Tr. at 81). Again, he alerted on unit 33 (Tr. at 81). Dax did not alert on any other unit (Tr. at 81). Detective Young notified Officer Weir of these findings, and then he began the process of applying for a search warrant for the unit (Tr. at 81).

16. Detective Young prepared an affidavit and contacted Jon Morris, the prosecuting attorney (Tr. at 82). The affidavit states that Young was notified that Bruce Conant was concealing methamphetamine and currency within a storage unit located at 210 Clough Street, Unit 33, Lebanon. Young was indeed notified of all of this information except the exact street address of the Mid-Town Storage facility -- he discovered that through his own investigation (Tr. at 90-92). After Mr. Morris reviewed Detective Young's documents, Mr. Morris requested an additional affidavit from Officer Weir about the execution of the search warrant at defendants' residence (Tr. at 82-83). Because Officer Weir had been involved in that search warrant, Mr. Morris believed that Officer Weir should provide that information by way of an affidavit (Tr. at 24, 83).

17.  Officer Weir was not the affiant who originally prepared an application for a warrant to search the Mid-Town Storage unit because it was located outside his jurisdiction (Tr. at 23).  Once Officer Weir's affidavit was reviewed and approved by Mr. Morris, all of the documents were taken to Judge Larry Winfrey who issued a warrant to search the storage unit based solely on the information contained in the affidavits (Tr. at 83-84).

18.  When the search warrant was executed, Officer Weir was present but did not conduct the search (Tr. at 25).  Detective Young was also present (Tr. at 84).  The Lake Area Narcotics Enforcement Group conducted the search and those officers seized a suitcase, two plastic tubes, cash bundles, and an unlocked black case containing a .38 revolver (Tr. at 84-85, 98-99, 104; P. Ex. 3).  Near the revolver was an item containing methamphetamine residue (Tr. at 96-97).  Also recovered were five glass devices, with residue, used to ingest methamphetamine (Tr. at 97).

19.  Following the searches, an informant told Officer Weir that the police had missed $125,000 during the original search of defendants' residence (Tr. at 25).  The informant said the money was either hidden in the walls of the house or buried in tubes in the back yard (Tr. at 25).  On July 19, 2012, Officer Weir prepared an affidavit in support of a second search warrant for the residence and presented it to Ken Clayton, the prosecuting attorney, who reviewed it before they took it to a judge (Tr. at

27).  When the warrant was executed, police did not find any more money at defendants' residence (Tr. at 36).  However, they did seize a small amount of methamphetamine from the garage (Tr. at 58–59).

20.  Ray's Self Storage is located on the north side of exit 140 at I–44 on the north outer road (Tr. at 106).  It is about 100 yards from the outer road junction of the exit (Tr. at 106).  Mid–Town Storage Facility is about 13 miles down the interstate from exit 140, and then another mile and a half from the interstate (Tr. at 106).  Ray's was the only storage facility at mile marker 140 in July 2012 (Tr. at 107).

### III. PROBABLE CAUSE

For a search warrant to be valid, it must be based upon a judicial finding that there is probable cause, that is, a "fair probability" to believe that the listed items may be found at the place to be searched.  Illinois v. Gates, 462 U.S. 213, 232, 246 (1983).  Such a determination is to be based upon the "totality of the circumstances."  Id. at 238.  In other words, the task of the issuing magistrate is to make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id.

The issue of probable cause need not be addressed because I find that the good-faith exception to the exclusionary rule

applies here.  Even if I were to agree with defendant that Officer Weir's original affidavit failed to establish probable cause to search defendant's residence, the evidence would nonetheless be admissible under the <u>Leon</u> good-faith exception to the exclusionary rule.  <u>United States v. Leon</u>, 468 U.S. 897, 920-921 (1984).  Under the <u>Leon</u> good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant.  <u>United States v. Hager</u>, 710 F.3d 830, 837 (8th Cir. 2013); <u>United States v. Patten</u>, 664 F.3d 247, 251 (8th Cir. 2011); <u>United States v. El-Alamin</u>, 574 F.3d 915, 924 (8th Cir. 2009).  When assessing the objective reasonableness of police officers executing a warrant, the court must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge.  <u>United States v. Hager</u>, 710 F.3d at 837; <u>United States v. Houston</u>, 665 F.3d 991, 995 (8th Cir. 2012); <u>United States v. Proell</u>, 485 F.3d 427, 431 (8th Cir. 2007).

In this case, defendant argues that the statement that the informant "has proven reliable in the past on six separate occasions" is insufficient to permit a finding of probable cause because (1) there is no indication that the previous information was related to criminal activity, and (2) there is no other basis for a finding that the informant was reliable.  However, in this case, police knew that the informant had provided information on

six occasions which resulted in seizure of illegal drugs through three search warrants and three consensual searches. Therefore, the alleged "ambiguity" in the affidavit -- i.e., that the information that had proved reliable in the past on six separate occasions was not necessarily related to criminal activity -- does not warrant suppression of the evidence seized pursuant to that warrant because the police knew that information to have been related to criminal activity.

The Eighth Circuit has recognized situations, however, which preclude a finding of good faith: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. United States v. Cannon, 703 F.3d 407, 412 (8th Cir.), cert. denied, 133 S. Ct. 2375 (2013); United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011), cert. denied, 132 S. Ct. 1713 (2012); United States v. Perry, 531 F.3d 662, 665 (8th Cir. 2008).

(1)  The first exception was already addressed in the separate motion for a Franks hearing and will not be repeated here. Defendant argues that Detective Young did not receive

17

information that defendant concealed anything in the storage unit; however, the evidence establishes that he received information that defendant was storing methamphetamine in a storage locker, a receipt for a storage locker was found in his residence, he had an access key to the storage facility, a drug dog alerted on the unit assigned to defendant, and Detective Young had determined the street address of that facility. The fact that defendant used another storage facility years earlier is not relevant considering all of the above and the fact that the informants had indicated that defendant had several storage units.

(2) There is no evidence that the issuing judge wholly abandoned his judicial role in issuing the warrant. In <u>United States v. Decker</u>, 956 F.2d 773 (8th Cir. 1992), the Eighth Circuit found that the judge issuing a warrant had wholly abandoned his judicial role by issuing a warrant without ever having read it:

> The warrant's glaring omission of the items to be seized supports the district court's finding that the issuing judge never read it. The judge's failure to strike the words "unlawfully stolen" from the warrant further supports this conclusion. The same can be said regarding the judge's failure to ensure that the prosecutor had signed the warrant, as required by Missouri law. Moreover, the judge himself admitted that he issued "the search warrant on the strength of what the officer told me," as opposed to relying on the written warrant and affidavit.
>
> We thus conclude that the district court did not clearly err in determining that the issuing judge failed to act in a detached and neutral manner.

On the contrary, there is no evidence (indeed no allegation) in this case that the issuing judge wholly abandoned his judicial role.

(3)  The third situation precluding a finding of good faith -- when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable -- is the most problematic.  The affidavit in this case consists of one paragraph.  It states that a confidential informant had "proven reliable" in the past on six separate occasions, but it does not state that the informant had provided reliable information about *criminal activity* or that the information provided in this instance by the informant was *not* based on first-hand knowledge.  That information, however, was known by Officer Weir.

The affidavit states that the bulk of defendant's drugs are kept in a storage locker; however, this affidavit was offered in support of a warrant to search defendant's residence, not a storage locker.  The affidavit states that "there is enough on hand for sales" -- it can only be inferred that this means there is enough *methamphetamine* on hand *at defendant's residence* for sales.  I have struggled with this case, because the affidavit relies very heavily on such inferences.  It does, however, state that Rhodenizer purchases methamphetamine from defendants, and it indicates that methamphetamine was seized from Rhodenizer on June 28, 2012.

Under United States v. Leon, 468 U.S. 897 (1984), the question of whether an officer's reliance on an issued warrant was objectively reasonable is a question of law, and courts may deny suppression motions "posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith." United States v. Leon, 468 U.S. at 925. The Supreme Court in Leon clearly anticipated that the good-faith exception to the exclusionary rule would, in most cases, prevent suppression of evidence seized pursuant to invalid warrants because it noted that a neutral magistrate's intervention in the "competitive enterprise of ferreting out crime" provides adequate protection of Fourth Amendment rights in many cases. The Court, citing Illinois v. Gates, 462 U.S. at 267, and United States v. Ross, 456 U.S. 798, 923, n. 32 (1982), noted that exceptions would be few when it stated that:

> searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.

United States v. Leon, 468 U.S. at 922.

With that in mind, I note a similar case wherein the Eighth Circuit found the good-faith exception applicable. In United States v. Carpenter, 341 F.3d 666 (8th Cir. 2003), the defendant challenged a search warrant whose affidavit stated that the informant had a relationship with "Christie" such that the informant could know detailed information about Christie's drug dealings. The defendant likened the affidavit to that in Aguilar

v. Texas,[6] 378 U.S. 108 (1964).

> In Aguilar, unlike the present case, there was no
> information to explain why the officer believed the
> informant to be reliable, no information to demonstrate that
> the informant had knowledge of innocent facts related to the
> suspect, no description -- numerical or functional -- of
> drug quantity, and no statement as to the existence of a
> relationship between the [informant] and the suspect that
> would explain the [informant's] knowledge. . . . United
> States v. Wright, 145 F.3d 972, 974-75 (8th Cir. 1998) ("The
> statements of a reliable confidential informant are
> themselves sufficient to support probable cause for a search
> warrant. . . . The reliability of a confidential informant
> can be established if the person has a history of providing
> law enforcement officials with truthful information.").
> Because, under Leon, we do not conduct a de novo review of
> the probable cause determination, we need not parse this
> distinction more finely. It is sufficient to note that
> Carpenter raises a close question concerning a legal
> deficiency. On such issues, officers may reasonably rely on
> the judgment of the issuing magistrate. We note, in
> addition, that Aguilar, as a rule of law standing on its
> own, has been superseded by the Gates[7] "totality of the
> circumstances" approach.

United States v. Carpenter, 341 F.3d at 671.

In this case, a prosecutor signed off on the search warrant,

and a judge issued the warrant.  Officer Weir knew that the

informant had provided information in the past that had resulted

in the seizure of illegal drugs on six different occasions, even

though his affidavit only included the conclusion that the

informant had provided reliable information six times before.

Officer Weir knew that the information obtained from informants

---

[6]The affidavit in Aguilar read as follows:  "Affiants have
received reliable information from a credible person and do
believe that heroin, marijuana, barbiturates, and other narcotics
and narcotic paraphernalia are being kept at the above described
premises for the purpose of sale and use contrary to the
provisions of the law."

[7]Illinois v. Gates, 462 U.S. 213 (1983).

was that defendants had supplied the methamphetamine found at Rhodenizer's residence about two weeks earlier and that defendants kept enough methamphetamine at their residence to make sales. All of this information establishes that the executing officers reasonably believed that the search warrant was valid, i.e., supported by probable cause.[8]

(4)  The final exception to Leon, that the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid, is likewise not applicable here. Such an exception would require that the affidavit allege no more than the possibility that suspects might be involved in crimes. See United States v. Scroggins, 361 F.3d 1075, 1084 (8th Cir. 2004) (the affidavit alleged more than that "unidentified suspects might be involved in violent crimes" and the showing in an affidavit to defeat this exception is "not high").

Based on all of the above, I find that the good-faith exception to the exclusionary rule enunciated in Leon applies to the first warrant to search defendants' residence.

As far as the warrant to search the storage unit, defendant's main argument is that the search consists of fruit of the poisonous tree, i.e., the illegal search of defendants' residence. Based on the above, I find that there was no illegal

---

[8]Because neither officer testified that he had received training specifically related to preparing affidavits in support of search warrants, it is my fervent hope that they will learn from this opinion and prepare more detailed affidavits in the future.

search of the residence and there can therefore be no fruit.

Furthermore when applying for the warrant to search the storage unit, police had the additional information that defendant was in possession of a statement and a key to unit 33 of the Mid-Town Storage facility, the informants had indicated that defendants may have multiple storage units for keeping drugs, and a drug dog had alerted on the unit to which defendant held the key.

Defendant argues that police included false information that defendant was storing drugs at the Mid-Town Storage in unit 33 because the CI had not given police any information about unit 33 and because "inquiry had been made of the storage facility off the 140 mile marker by law enforcement officers and storage officials informed them that the defendant was not renting a unit nor had he for over three years." (document number 46, page 2, paragraph 10). Defendant is apparently referring to exhibit E1 attached to a motion filed by co-defendant Rendy Conant, document number 52 at page 52-6 (which was not offered as an exhibit during the hearing). This is a letter "to whom it may concern" signed by Patsy Ray of Ray's Self Storage. The letter is dated August 23, 2013 -- more than 13 months after the police affidavits were prepared -- and includes the following:

> This is to confirm that Bruce Conant rented Unit 8B at our storage facility at T Hwy and Old Rt 66 (Stoutland exit on I-44) from November 2006 through May 2009.
>
> We received an inquiry from a Sheriff Office (can't remember which one) in 2012 wanting to know if we were renting to Mr. Conant at that time and we told him no.

23

This letter casts no doubt on the accuracy of the information contained in the affidavits. There is no evidence that the inquiry was made prior to the affidavits being prepared, and there is no evidence that anyone associated with this investigation ever made an inquiry.

For an affidavit to properly support a search warrant, the court must find only that, considering the totality of the circumstances, there is a fair probability that the items listed in the warrant will be found in the place to be searched. Common-sense inferences are permitted -- if the confidential informant said that defendant kept drugs in one and maybe more storage units, and police find in defendant's possession a receipt and a key for a storage unit, and a drug dog alerts on the unit rented by the defendant, it is permissible for the police to infer that the defendant is storing drugs at that unit. Defendant's argument relies on an invalid premise that nothing provided by the CI can be used in the affidavit because the storage facility referred to was not precisely at mile marker 140 on I-44. The law requires courts to look at the totality of the circumstances, and there is no legal authority for disregarding information provided by a CI merely because he or she does not know the precise address where a storage locker was located.

Even without the information provided by the informant, police would have probable cause to believe drugs were being stored in unit 33 of the Mid-Town Storage because drugs and cash were found in defendant's residence, defendant had a storage

24

receipt in his possession, he had a storage unit key in his wallet, and a drug dog alerted to the storage unit rented by the defendant.

## IV. CONCLUSIONS

Based on all of the above, I find that (1) it was objectively reasonable for the officers executing the search warrant at defendant's residence to have relied in good faith on the judge's determination that there was probable cause to issue the warrant, and (2) the affidavits in support of the warrant to search the storage unit established probable cause that evidence of illegal drug activity would be found there.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motions to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 10, 2014